Vincent P. Vigilante and Mary C. Vigilante v. Commissioner.
Vigilante v. Commissioner
Docket No. 2738-64.
United States Tax Court
T.C. Memo 1966-161; 1966 Tax Ct. Memo LEXIS 122; 25 T.C.M. (CCH) 850; T.C.M. (RIA) 66161; July 7, 1966
Julian C. Tepper, for the petitioners. Rudolph J. Korbel, for the respondent. TANNENWALD
Memorandum Findings of Fact and Opinion TANNENWALD, Judge: Respondent determined a deficiency in petitioners' Federal income tax for the year 1957 in the amount of $2,460.03. The sole issue with which we are concerned is: Did petitioner Vincent Vigilante receive more than 30 percent of the sales price of certain stock he sold in that year so as to preclude his use of reporting the profit therefrom on the installment method pursuant to section 453? [1] *123 Findings of Fact Vincent P. Vigilante and Mary C. Vigilante are husband and wife and filed their joint income tax return for the calendar year 1957 with the district director of internal revenue, Brooklyn, New York. Any reference to "petitioner" shall be a reference to Vincent, Mary being a party to this proceeding solely by having filed a joint return with Vincent. Citywide Family Sales Corp. (hereinafter referred to as the "Corporation") was organized in 1952 for the purpose of conducting door-to-door installment sales of housewares. The original stockholders of *124 the Corporation were as follows: Percentage
Percentage
of preferred
of common
Stockholder
stock held
stock held
Milton Solow
100
45
Martin Rogers
0
45
Vincent P. Vigilante
0
10
Some time in 1954, Solow and Rogers began a procedure of diverting the proceeds of some sales from the Corporation to the stockholders, apportioning them among the stockholders in proportion to their stock ownership. The divided proceeds were not included in the Corporation's income. While at the beginning only a small percentage of the sales of the Corporation were unreported, the percentage increased until 1957. Petitioner became dissatisfied with the arrangements with respect to the division of the proceeds and threatened Rogers and Solow unless they bought his interest in the Corporation. On July 20, 1957, Solow and Rogers agreed orally to purchase petitioner's interest for the sum of $25,000 of which a down payment of $6,500 was to be made on or before October 1, 1957, $5,500 was to be paid before January 1, 1958, and $13,000 was to be paid in monthly installments of $1,000 each beginning in January 1958. On the same day, a written agreement was prepared by *125 Solow and signed by the parties involved. It stated that petitioner was selling his interest for $6,500 (rather than the $25,000 agreed upon) because it was believed that the book value of petitioner's interest was about $6,500. Solow and Rogers did not want the $25,000 figure to be put in writing because they planned to pay the other $18,500 in cash out of proceeds of the diverted sales. Also on the same day petitioner received thirteen $1,000-face-value notes signed by Solow and Rogers which became due on the first day of each month from January 1958 to January 1959, inclusive. On October 1, 1957, petitioner received a personal check from Solow in the amount of $3,250 and shortly thereafter a similar check from Rogers. Petitioner received no other payments in 1957 with respect to the sale of his stock. On October 1, 1957, petitioner resigned as vice president of the Corporation. However, petitioner continued to work for the Corporation until the second week of January 1958. On several occasions in 1957, petitioner demanded from Solow the $5,500 he had been promised orally but he did not receive it. Finally, in January 1958, after he was refused by Solow again, petitioner *126 decided to forget about collecting it. Petitioner presented the first, second, and third of the thirteen notes in January, February, and March 1958, respectively, receiving in each instance the sum of $1,000 in cash. In April 1958, petitioner moved to Florida and turned the balance of the notes over to an attorney, Tobias Tepperman, for presentation and collection thereon. All of the notes were paid in 1958 and returned to Solow and Rogers. Petitioner reported the $6,500 received in 1957 as capital gain from the sale of his stock on his 1957 Federal income tax return. He reported $13,000 in the same manner on his 1958 return. Petitioner received less than 30 percent of the sales price in 1957. Opinion Respondent contends that petitioner received more than 30 percent of the sales price in 1957, the year of sale, and therefore should have reported the full amount of his profit in 1957. Section 453(b)(2). He argues that petitioner received either $12,000 ($6,500 by check and $5,500 by cash) in 1957 of a $25,000 sales price or, alternatively, $6,500 of a sales price of $19,500. As to the first alternatives, petitioner testified that he was promised not only the $6,500 but *127 also an additional $5,500 to be paid prior to January 1, 1958 but that, despite his demands for payment of the latter sum, it was never paid to him. Respondent's witnesses (Solow and Rogers) testified that petitioner on July 20, 1957 received five additional notes representing the $5,500, one in the amount of $1,500 due August 1, 1957 and four in the amount of $1,000 each due on the first day of each of the last four months of 1957. They further testified that these notes were paid in 1957. We find that the testimony of respondent's witnesses lacks credibility. The import of the testimony is that the terms of the sale by petitioner called for notes due prior to, as well as subsequent to, the date on which the down payment was to be made. Such a pattern would, to say the least, be unusual. Moreover, it is curious that, according to their testimony, each of the thirteen notes paid in 1958 was returned by petitioner upon receipt of payment, but the five notes allegedly given and due in 1957 were not returned to them but supposedly allowed to be destroyed by petitioner. Furthermore, it is hard to reconcile the fact of payment of the five notes with the testimony of Solow and Rogers that *128 they gave petitioner the checks for the $6,500 later because they "needed time to accumulate the money to pay for that stock according to that agreement." Accordingly, based upon the entire record before us, we find that petitioner did not receive payment of the $5,500. Respondent's second alternative is that, because petitioner did not get paid $5,500 in 1957, the sales price was either originally $19,500 or adjusted down to $19,500 in 1957 and therefore petitioner did not meet the 30 percent limit, having received $6,500 in 1957. Respondent is apparently far from convinced on this approach, for he merely mentions it in passing in his brief. In any event, we disagree. We have found that the sales price was $25,000 and that petitioner approached Solow for the money on several occasions and was told he would get it. Finally, in January 1958, when petitioner again demanded the money from Solow and was refused, he decided to forget about it. We doubt that, on these facts, there was any adjustment of the sales price, but, if there was, it occurred in 1958 and would not deprive petitioner of the right to utilize the installment method of reporting in 1957. Dalriada Realty Co., Inc., 5 B.T.A. 905 (1926), *129 acq. VII-1 C.B. 8; 2 Mertens, Law of Federal Income Taxation, sec. 15.21, p. 50. Decision will be entered for the petitioners. Footnotes
1. All references are to the Internal Revenue Code of 1954. During the opening statements at the trial, there was some suggestion that, even assuming that petitioners were entitled to use the installment method of reporting, they did not properly elect so to do. However, this point was not pursued on brief, and we therefore consider that respondent has abandoned any such contention. We note that there is also an issue as to the amount of medical deduction allowable to petitioners, but this merely involves a technical adjustment which is solely dependent upon our decision with respect to the principal issue.↩